FILED
2020 Sep-14  PM 04:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **vs.** | ) | **2:19-cr-324-ACA-HNJ** |
| | ) | |
| **RONALD TAI YOUNG MOON,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

After FBI agents uncovered covert video recordings of the defendant's neighbors and house guests, the government charged the defendant, Dr. Ronald Tai Young Moon ("Dr. Moon"), with two counts of production of child pornography, two counts of attempt to produce child pornography, and two counts of possession of child pornography. (Doc. 84). A jury found Dr. Moon guilty on all six counts. (Doc. 127). Dr. Moon moves for judgment of acquittal or, alternatively, for a new trial. (Doc. 132). For the reasons set forth below, the court **DENIES** the motions.

### I.    BACKGROUND

On January 15, 2019, agents from the Federal Bureau of Investigation and Drug Enforcement Agency raided The Industrial Athlete, a medical clinic owned and operated by Dr. Moon. Armed with a search warrant, the agents searched for evidence of a "pill mill" and health care fraud.

As part of the search, agents entered Dr. Moon's personal office and began searching.  (Doc. 135 at 24).  There, among Dr. Moon's diplomas, certifications, and family photographs, DEA Agent Wade Green discovered VHS tapes in a bag and box next to Dr. Moon's desk.  (Doc. 135 at 28, 35).  While in Dr. Moon's office, Agent Green reviewed some of the videos using a TV/VCR unit located next to Dr. Moon's desk.  (Doc. 135 at 25–26).  Agent Green's review revealed covert video recordings of adult women and minor girls, some of whom were in various stages of undress.

In all, agents collected over sixty VHS tapes from inside Dr. Moon's office. (Doc. 135 at 37, 44, 60).  Of those sixty tapes, twenty-six contain only legal pornography.  (GX 15–40; *see also* doc. 142 at 13, doc. 139 at 91).  Fourteen other tapes contain a variety of footage, including amateur home videos of the Moon family (GX 3, GX 11, GX 13, GX 14), women's gymnastics (GX 2, GX 14), sexually explicit movies (GX 4), legal pornography (GX 3, GX 4, GX 11, GX 13), and mixed martial arts.  (GX 6).  All but one of these fourteen tapes also contain covert recordings of women and girls.  (GX 1–11, GX 13–14)  The court refers to these fourteen videos as the "Mix Tapes."[1]

---

[1] GX 12 was not admitted into evidence.  Consequently, the Mix Tapes at issue are GX 1–GX 11 and GX 13–GX 14.

Four of the Mix Tapes containing covert videos of girls form the basis of the six charged offenses.  GX 1 formed the basis of Count One (producing and attempting to produce child pornography) and Count Five (possession of child pornography).  GX 2 formed the basis of Count Two (attempting to produce child pornography).  GX 3 formed the basis of Count Three (attempting to produce child pornography).  And GX 4 formed the basis of Count Four (producing and attempting to produce child pornography) and Count Six (possession of child pornography).

a. *Pretrial Proceedings*

Dr. Moon pleaded not guilty to the charges listed against him in the superseding indictment.  As the case proceeded to trial, the defense sought to suppress the Mix Tapes based on the theory that the search warrant for The Industrial Athlete was invalid because the affidavit submitted with it contained misrepresentations that were material to the magistrate judge's finding of probable cause.  (Doc. 39)  After hearing argument on the motion, the court found that the defense failed to make a substantial preliminary showing that the affidavit contained deliberate or reckless misrepresentations or omissions that were material to finding probable cause.  (Doc. 75).  Accordingly, the court denied defendant's motion for a *Franks* hearing.  (*Id.*).

At a pretrial conference on the eve of trial, the parties argued several motions in limine, many of which the defense now seeks to relitigate under the auspices of a Federal Rule of Criminal Procedure 33 motion for a new trial. *See infra* at 37-47. In addition, because the layout of the courtroom makes it impossible to show a video to the defendant, jury, and witness without being visible to the audience, the government announced that it would ask for the courtroom to be closed during the presentation of videos containing covertly recorded nude imagery of the victims. (Doc. 141 at 10). Rather than entertaining a global motion and objection, the court instructed the parties to approach each time they intended to show such evidence so that the court could consider each closure individually. (*See id.*). On the morning of trial, the parties informed the court off the record that they had reached an agreement on when the courtroom should be closed and that they would inform the court about when closure was appropriate. The case then proceeded to trial.

*b. The Trial*

Over two and a half days, the government presented its case to a jury. The court admitted a total of forty out of the sixty VHS tapes collected from inside Dr. Moon's office at the Industrial Athlete. (Doc. 135 at 61; GX 1–GX 40). For technological reasons, however, the government did not use the VHS tapes to play the content of any video; instead, the government put digital copies of thirteen of the Mix Tapes on a thumb drive; the entirety of each tape was saved in its own folder

on the thumb drive, labeled GX 1 through GX 11, GX 13, and GX14.  (*See* Doc. 135 at 75).  The thirteen videos were labeled GX 1A through GX 11A, GX 13A, and GX 14A.  The government never played the entirety of any exhibit, but instead played select, relevant clips.  To do so, the government took excerpts of the videos and saved the clips within the associated folder (so folder GX 1 contained the full video, saved as GX 1A, as well as clips taken from that video, saved as GX 1A1, etc.).  The court admitted the thumb drive into evidence.

On the first day of trial, FBI intelligence analyst Tina Mauldin testified about the contents of all forty VHS tapes in general.  (Doc. 135 at 87).  According to Ms. Mauldin, many of these videotapes contained legal adult pornography while some contained a mix of home videos, covert camera videos, legal pornography, and recordings of movies off a television screen.  (*Id.* at 87–88; *see* GX 3, GX 4, GX 11, GX 13).  Ms. Mauldin also testified that some of the covert recordings featured girls under the age of 18.  (Doc. 135 at 192).  Some of those videos contained nudity. (*Id.*).  Of the videos containing nudity, two of them showed the girls' naked pubic area.  (Doc. 135 at 193; *see* GX 1A9, GX 4A6).

It is undisputed that the covert recordings forming the basis of the charges against Dr. Moon were taken from inside two of Dr. Moon's houses: one home in Hoover, where the Moon family lived from 1994 to 2002, and one home in Vestavia Hills, where the Moon family has lived since 2002.  (Doc. 137 at 95, 114; *see also*

Doc. 138 at 95).  Some of the covert recordings appeared to be taped by a handheld video recorder from inside one house into another house.  (Doc. 135 at 94).  Others appeared to be recorded from within a bathroom.  (*Id.* at 161).  The person recording the video occasionally zoomed in on the individuals he secretly recorded from the other house.  (Doc. 135 at 94).

The jury next heard from thirteen victims who identified themselves in the covert recordings.  Eight of these women were minors at the time they were recorded.  Several of these victims testified they were friends of Dr. Moon's daughter during middle school.  (Doc. 136 at 27, 39, 54, 66, 207).  Two of them were Dr. Moon's next-door neighbors.  (Doc. 136 at 143, 208).  All of them were in middle school when the videos were recorded.  (*See* Doc. 136 at 26, 42, 56, 68, 80, 150; 208).  One victim identified herself in footage covertly recorded in the basement bathroom of Dr. Moon's Vestavia Hills home.  At the time of the recording, she was thirteen years old.  (Doc. 136 at 209).  She and a group of friends had returned to Dr. Moon's home after a school dance.  (Doc. 136 at 29–30, 56, 67, 208; Doc. 138 at 61).  The video recorded the young woman as she went from the sink area of the bathroom wearing her dress, entered and then shut the door to the area in which the toilet and shower were located, and then returned to the sink area in her bathing suit.  (*Id.* at 211; GX 1A9).  Thirty seconds later, the video shows the victim taking off

her bathing suit in the sink area of the bathroom.  (*Id.*).  She is recorded fully nude with her pubic area visible.  (Doc. 136 at 212; GX 1A9).

Another victim was recorded inside the Moon's Vestavia home while changing into her bathing suit on the evening of the eighth-grade dance.  (Doc. 136 at 32–33, GX 1A3, GX 1A8).  She was also recorded urinating.  (*Id.* at 34).  Other victims from the same night are also captured on video.  In all the recordings, the victims are in the same bathroom either fully clothed or naked above the waist.  (GX 1A3, GX 1A5, GX 1A10, GX 1A11, GX 1A12).

Another victim described recordings which captured the interior of her home located next door to Dr. Moon's Hoover residence.  The recordings capture both her and her twin sister on numerous occasions and in various state of undress.  In some of the recordings, the camera zoomed in and out while filming.  (Doc. 136 at 154–155; GX 4A2, 4A6; Doc. 135 at 94; GX 4A4).  In one clip, the victim is recorded fully nude with her pubic area exposed.  (GX 4A6).  In that clip, the camera zooms in on her.  (*Id.*; Doc. 136 at 155–156).

In addition to the testimony from the victims, six former Industrial Athlete employees testified.  Each of these witnesses identified the room where the VHS tapes were discovered as Dr. Moon's private office.  All of them testified that Dr. Moon accessed the office regularly.  (Doc. 136 at 96, 100, 513; Doc. 137 at 61, 73).  They also testified the door to the office remained locked and only Dr. Moon

had a key.  (Doc. 136 at 100, 116, 125, 135-136; Doc. 137 at 66).  Only one of these witnesses testified she ever went into Dr. Moon's office.  (Doc. 137 at 68 (testifying she went into Dr. Moon's office three or four times over the course of eighteen years of employment)).  Indeed, not only cleaning services had access to Dr. Moon's office despite consistent testimony that Dr. Moon regularly used the restroom inside his office.  (Doc. 136 at 96)

For his defense, Dr. Moon presented evidence that alternate perpetrators committed the crimes and argued the videos were not child pornography because they did not constitute a lascivious exhibition of the genitals.  The majority of the Dr. Moon's defense was presented through the testimony of his wife, Sally Moon.

Mrs. Moon testified the Moons owned a camcorder that was stored in an upstairs bedroom of their Hoover home.  In early 2000, the camcorder went missing.  (Doc. 137 at 114).  Fifteen years later, Dr. Moon entered his Vestavia home carrying a box which contained the lost camcorder and an assortment of VHS and microcassette tapes.  (Doc. 137 at 115).  That evening, Dr. and Mrs. Moon viewed one of the videotapes, which included a recording of Mrs. Moon showering with her children in a bathroom in Hoover.  (Doc. 137 at 117).  According to Mrs. Moon, she became very upset and asked Dr. Moon to destroy the videotapes that had her on them.  (*Id.* at 118).  After that, Mrs. Moon stopped viewing the videotapes, but

Dr. Moon continued.  (*Id.* at 119).  Later that evening, Dr. Moon told Mrs. Moon their Hoover neighbor had been recorded, too.  (*Id.*).

Mrs. Moon testified she instructed her husband to remove the videotapes from their home but not to destroy them because she wanted to salvage the family home videos contained on the tapes.  (*Id.* at 120).  To accomplish this, Mrs. Moon purchased a "separator," which separates clips of videos "to get what you want and keep out what you don't want."[2]  (Doc. 137 at 120).  Mrs. Moon tasked Dr. Moon with extracting their family videos.  (*Id.*).  According to Mrs. Moon, Dr. Moon took the videos to his office and went through them over the course of the following four to six weeks.  (*Id.* at 133).

In those four to six weeks, Mrs. Moon learned from Dr. Moon that her sister was covertly recorded while undressing.  (Doc. 137 at 133).  According to Mrs. Moon's testimony, she learned the covert recordings included minors only after the FBI became involved in this case.  (Doc. 138 at 13).  Mrs. Moon never told the Hoover neighbor about the videos because the person Mrs. Moon suspected of making the recordings had died, and she didn't "want to dig up something and hurt [the neighbor]."  (*Id.* at 122).  Plus, Mrs. Moon had "lost track of [the neighbor] anyway for years."  (*Id.*)

---

[2] In later testimony, Mrs. Moon refers to the device as an "extractor."  (Doc. 138 at 7).

As part of her testimony, Mrs. Moon identified the two alternate perpetrators offered as part of Dr. Moon's defense. The first is Dr. Rod Wilkinson, a friend of the Moon family. According to both Mrs. Moon and the Moons' daughter, Taylor, Dr. Wilkinson regularly studied at the Moon's Hoover residence in the upstairs bedroom that looked on one recorded neighbor's home—the same room where the camcorder was stored. (Doc. 137 at 123–124; Doc. 138 at 98). Mrs. Moon testified she believes Dr. Wilkinson was responsible for the tapes because he had "amazing tech skills." (*Id.* at 124). According to Mrs. Moon, Dr. Wilkinson is the "only one that I can possibly think of that had the skill and access to that room." (*Id.*).

The Moons called on Dr. Wilkinson's tech skills in 1998 when they wanted to install a surveillance system at The Industrial Athlete. (Doc. 137 at 126). Dr. Wilkinson installed a camera system to record the common areas of the building. (*Id.* at 127). To complete the project, Dr. Wilkinson enlisted the help of his friend, Jeremy Simpson. (*Id.* at 126–27; Doc. 138 at 99).

Dr. Wilkinson died about three years after the Moons moved to Vestavia. (Doc. 137 at 125). Before his death, Dr. Wilkinson visited the Moons at their Vestavia home. (*Id.*). Both Mrs. Moon and Taylor testified that Dr. Wilkinson occasionally studied in the basement of their Vestavia home. (Doc. 137 at 125; Doc. 138 at 101).

After Dr. Wilkinson's death, the Moons called Mr. Simpson when they needed technical assistance.  (Doc. 131 at 153; Doc. 138 at 103).  According to Mrs. Moon, Mr. Simpson worked primarily in the basement where a "technology closet" was located.   (Doc. 137 at 142–143).   According to Taylor Moon, Mr. Simpson was around "a lot."  (Doc 138 at 104).

In fact, Mrs. Moon called Mr. Simpson to the Vestavia home after Dr. Moon came home with the missing camcorder and videotapes.  (Doc. 138 at 9).  Mr. Simpson was instructed to "try to figure out where any hidden cameras could be." (*Id.*).  Mrs. Moon was present on the day that Mr. Simpson came to do his inspection. (*Id.* at 10).  Although she witnessed Mr. Simpson walking around the house, Mrs. Moon did not follow him in search of hidden cameras.  (*Id.* at 9–10).  She also observed Mr. Simpson holding something in his hand and a little box with items in it, but she did not know what the items were and apparently did not bother to ask. (*Id.* at 10).

Mr. Simpson did not testify at trial because, like Dr. Wilkinson, Mr. Simpson is now dead.  Both Taylor Moon and Mrs. Moon last saw Mr. Simpson late one night when he appeared at their Vestavia home.  (Doc. 138 at 11, 138).  According to both Taylor and Mrs. Moon, Dr. Moon answered the door.  (*Id.*).  A brief argument ensued; although Taylor could not hear what was said, Mrs. Moon heard the two

men talking about money.  (*Id.*).  Mrs. Moon described Dr. Moon as being "visibly upset" after Mr. Simpson left.  (Doc. 138 at 12).

Through the testimony of one of Dr. Moon's patients (doc. 138 at 119), the defense also provided corroborating evidence that Dr. Wilkinson and Mr. Simpson were friends, that both were technologically savvy, and that Mr. Simpson installed surveillance cameras.  (Doc. 138 at 122).  Through expert testimony, the defense established that at the time the Vestavia recordings were made, technology allowed for the transmission of covert camera recordings to anywhere in the world.  (Doc. 138 at 212–13, 215).

The jury began its deliberations at 11:37 AM.  (Doc. 139 at 84).  At 2:20 PM on the same day, the jury sent out a note asking: "We would like to examine tapes? Is there an inventory of what is contained on tapes?  Computer w/ thumb drive?" (Doc. 125; Doc. 139 at 84–85).  The court brought the jury back to clarify what they were asking.  (Doc. 139 at 85–86).  When the court asked what the jury meant by examining the tapes, the foreperson said "Physical, just—we want to look at—" and agreed when the court asked if the jury just wanted to bring the evidence back into the room.  (*Id.* at 86).

Next, the court asked what the jury meant by asking for an inventory of the tapes.  (Doc. 139 at 86–87).  The foreperson stated the jury wanted to view some of the clips again, but did not "want to have to go through . . . 30 clips to try and find . . .

where, you know, a certain thing happened." (*Id.* at 87; *see also* 88 ("[R]ather than going through—like I said, going back through 50 clips looking for something, if we do come up with something specific that we're looking for, it sounds like what you're telling me is we could make that request and you could tell us where to look?")).

Neither party objected to giving the jury the physical VHS tapes, but the defense objected to providing any catalog of the videos. (Doc. 139 at 89–92). The court therefore informed the jury it could not provide a catalog or inventory of the tapes, but it would send back a thumb drive with a computer so the jury could view the videos contained on that thumb drive. (Doc. 139 at 92–93). The jury returned to deliberating at 2:34 PM. (*Id.* at 93). The court then informed the parties the jury room does not contain a TV. (*Id.*). The court also notes that even if the jury room had a TV, it does not contain a VHS player of any sort.

At 4:44 PM, the court released the jury for the evening with an instruction to return and continue deliberations at 8:30 AM the next day. (Doc. 139 at 95). At 10:22 AM the next day, the jury indicated it had reached a verdict. (Doc. 140 at 3). The jury found Dr. Moon guilty on all counts. (*Id.*).

## II.    DISCUSSION

Dr. Moon seeks a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, alternatively, a new trial under Federal Rule of Criminal Procedure Rule 33.

### A. Motion for Acquittal

Dr. Moon moves pursuant to Rule 29 for judgment of acquittal specifically arguing: (1) the court lacked jurisdiction over Counts Three and Four (doc. 132 at 6 (incorporating doc. 137 at 33)); and (2) the recordings do not depict minors engaging in "sexually explicit" conduct (*id.* at 6–8).  Dr. Moon also moves for a judgment of acquittal based on the sufficiency of the evidence in general.  (Doc. 132 at 6).

When considering a motion for the entry of a judgment of acquittal based on sufficiency of the evidence, the court must view the evidence in the light most favorable to the government and make all reasonable inferences and credibility determinations in the government's favor.  *United States v. Grzybowicz*, 747 F.3d 1296, 1304 (11th Cir. 2014).  A jury's verdict should stand unless there is no "reasonable construction of the evidence that would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  *United States v. Friske,* 640 F.3d 1288, 1291 (11th Cir. 2011).

### 1. *Interstate Nexus for Counts Three and Four*

Dr. Moon contends the government failed to establish the jurisdictional element of Counts Three and Four because the only evidence establishing an interstate nexus over these specific tapes was the "Made in Japan" inscription on the tapes. (Doc. 137 at 33–34). But a reasonable jury, viewing this evidence and making all reasonable inferences in the government's favor, could have easily found that the inscription established the jurisdictional element beyond a reasonable doubt. *United States v. Clay,* 355 F.3d 1281, 1287 (11th Cir. 2004) (gun bearing the inscription "Colt Manufacturing Company, Hartford, Ct." sufficient evidence that the firearm travelled in interstate commerce when found in the possession of a felon located in Georgia). Moreover, even if the inscription was insufficient to establish where the tape was manufactured, both 18 U.S.C. § 2251(a) and 18 U.S.C. § 2252A apply to wholly intrastate production and possession of child pornography. *United States v. Smith*, 459 F.3d 1276, 1284 (11th Cir. 2006).

### 2. *Lasciviousness*

To establish Dr. Moon's guilt on all six counts of the superseding indictment, the government had to prove that (1) he knowingly attempted to produce, or produced and possessed (2) images of a minor (3) depicting that minor engaging in "sexually explicit conduct" (4) using any means or facility in or affecting interstate or foreign commerce by any means. *Grzybowicz,* 747 F.3d at 1305 (citing 18 U.S.C. §§ 2251(a) and 2252A(5)(B)). Dr. Moon contends the government's evidence was

insufficient to establish that any of the images at issue in this case depict a minor engaging in "sexually explicit conduct." The court disagrees.

The parties agree that, for our purposes, the images depict "sexually explicit conduct" if they include the actual or simulated "lascivious exhibition of the . . . pubic area." 18 U.S.C. § 2256(2)(A)(v); (*see also* Doc. 132 at 6; Doc. 145 at 16). "'Lascivious exhibition' has been previously defined as one that potentially 'excites sexual desires' or is 'salacious.'" *Grzybowicz,* 747 F.3d at 1306. Whether an image is "lascivious" is fact specific and not concrete. *United States v. Williams,* 444 F.3d 1286, 1299 (11th Cir. 2006). "[F]or this reason, it is necessary to determine the potentially lascivious nature 'with respect to the actual depictions themselves.'" *United States v. Holmes*, 814 F.3d 1246, 1251 (11th Cir. 2016) (quoting *Williams*, 444 F.3d at 1299). In examining the evidence, the factfinder can consider the intent of the person creating the image. *See Holmes*, 814 F.3d at 1252 (conduct of defendant considered in determining lasciviousness).

Here, viewing this evidence and making all reasonable inferences in the light most favorable to the government, there was ample evidence from which a reasonable jury could have found beyond a reasonable doubt that two of the images contained in GX 1 and 4 were lascivious exhibitions of the pubic area. (*See* GX 1A9, GX 4A6). There is also ample evidence upon which a reasonable jury could

have found beyond a reasonable doubt that the remaining images on GX 1–4 were attempts at producing images of a lascivious exhibition of the pubic area.

The government provided evidence of covertly recorded videos of Dr. Moon's neighbors and his daughter's friends naked without their approval and consent. Some of these minor girls were fully naked.  All the girls were around the same age. In at least one of the videos, the camera is zoomed in on the victim's naked body. Moreover, the location of the videos was either a bathroom or a bedroom, both of which are rooms where people are likely to be found nude.  *See Holmes*, 814 F.3d at 1252 (considering that the defendant placed the hidden camera in a location where the victim was "most likely to be videoed while nude" factored into the determination whether the images captured were lascivious).  Each of these recordings were contained on VHS tapes that also contained clips of other sexually explicit or pornographic material.  Finally, these VHS tapes were stored with many other pornographic tapes.

Based on all the foregoing and viewing the evidence in the light most favorable to the government, a reasonable jury could have found that GX 1A9 and GX 4A6 constituted a lascivious exhibition of the pubic area.  Accordingly, Dr. Moon's motion for acquittal based on the government's proof of lascivious exhibition is due to be denied.

### 3.  The Sufficiency of the Evidence in General

Dr. Moon's motion for acquittal based on the sufficiency of the evidence in general is also due to be denied.  Dr. Moon's current motion makes no argument about the general sufficiency of the evidence, instead incorporating by reference the argument made when he moved for judgment of acquittal at the close of evidence. (Doc. 132 at 6).  At that time, he made a "general argument" that the government had not presented sufficient evidence to prove every element of each count (doc. 137 at 33).  The only specific arguments he made were about the interstate nexus and lasciviousness.  (*Id.* at 33–35).  At the close of the defense's case, he renewed the motion without making any specific arguments.  (Doc. 139 at 4).

The court has already addressed and rejected the two specific arguments Dr. Moon made.  His "general argument" that the sufficiency of the evidence was deficient in some unspecified way does not obligate the court to review all of the evidence on its own in an attempt to determine whether the government supported every element of every count.  *Cf. United States v. Baston*, 818 F.3d 651, 663–64 (11th Cir. 2016) (reviewing specific sufficiency arguments for plain error where the defendant had made a "general" motion for judgment of acquittal and then raised specific grounds for acquittal on appeal).

In any event, the government produced ample evidence from which a reasonable juror could find that Dr. Moon was the individual who recorded the

images.  Witness testimony established the videos were recorded in two separate decades and in two separate homes owned by Dr. Moon.  The tapes were all found in Dr. Moon's office.  Six of Dr. Moon's employees testified Dr. Moon was the only person with a key to his office.  The tapes also contained home videos of the Moon family—some of which Dr. Moon himself recorded.  (GX 4, 11, 13, and 14).  The tapes also included recordings of a television screen playing movies (GX 3, 11, and 13) and in one of them, it is evident Dr. Moon was present in the room.  (GX 13).

Based on all the foregoing and viewing the evidence in the light most favorable to the government, a reasonable jury could have found that Dr. Moon was the individual who covertly recorded these women.  And, as stated previously, there is sufficient evidence that the recordings constitute lascivious exhibitions.  Accordingly, Dr. Moon's motion for acquittal on the sufficiency of the evidence in general is denied.

### B. Motion for a New Trial

Dr. Moon also seeks a new trial under Federal Rule of Criminal Procedure 33.  Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Dr. Moon contends that justice requires a new trial because of: (1) insufficient evidence to support his conviction; (2) the court's failure to conduct a *Franks* hearing; (3) the court's failure to strike certain jurors for cause; (4) closing the courtroom during certain testimony as agreed upon by the

parties; (5) the court requiring him to comply with Department of Justice regulations about calling an agent to testify; (6) testimony regarding his failure to disclose a crime perpetrated against him; (7) improper evidentiary rulings and (8) improper jury instructions.   Dr. Moon contends that these eight points—singularly or collectively—"merit a new trial because the interest of justice requires one in order to prevent a serious miscarriage of justice."   Although many of these arguments warrant little discussion, the court discusses each point in turn.

### 1. *Sufficiency of Evidence*

In analyzing the sufficiency of the evidence under Rule 33, the court is not required to view the evidence in the light most favorable to the verdict and the court may weigh the evidence and consider the credibility of the witnesses. *United States v. Hernandez,* 433 F.3d 1328, 1335 (11th Cir. 2005).   If the court determines that, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.* (citations omitted).

Dr. Moon argues his evidence of alternate perpetrators preponderates against the government's circumstantial evidence that Dr. Moon is responsible for the covert recordings.   The court, having weighed the evidence of the alternate perpetrators and

assessed the credibility of the witnesses testifying on this subject, disagrees.  Put simply, the defense's theory is incredible.

First, there is the issue of the alternate perpetrator's identity.  It was unclear throughout the trial whether Dr. Moon accused both Dr. Wilkinson and Mr. Simpson of recording these covert videos or accused Dr. Wilkinson of recording them and Mr. Simpson of attempting to extort Dr. Moon after he found them.  (Doc. 137 at 124 (Sally Moon testifying that only Dr. Wilkinson was capable of covertly recording these videos); *id.* at 121 (Sally Moon testifying that "the person" who did this was dead); doc. 138 at 11 (Sally Moon testifying that Mr. Simpson appeared at the Moon home late at night demanding money); doc. 138 at 138 (Taylor Moon testifying similarly)).  If all the tapes were the work of one man—Dr. Wilkinson— there is no explanation for the recordings taken in 2009, four years after Dr. Wilkinson's death.  Nor is it clear how covert recordings taken in 2009 made their way on the Mix Tapes.

The alternative theory is equally suspect.  It seems incredible that two different men would commit the same crime against the same family in two different homes.  And Dr. Moon has not made any explanation as to how Mr. Simpson would have located and come to possess the tapes made in Hoover.  After all, if Mr. Simpson knew about—and was complicit in—the covert recordings made during Dr. Wilkinson's lifetime and continued the criminal behavior after his death, it seems

improbable Mr. Simpson would expose his crime by delivering the Mix Tapes to Dr. Moon.

And then there is the issue with the Mix Tapes themselves. Even if Mrs. Moon's testimony regarding the sudden and unexpected return of the lost camcorder is fully credited, it still does not explain how the videos themselves made their way from the Moon's house in Hoover to wherever Dr. Moon allegedly found them. Mrs. Moon testified the camcorder was lost, not a box of videos. Yet when testifying about the night the camcorder returned to her home, Mrs. Moon described her excitement over the return of her "precious" family movies.

In addition, there is the issue of the credibility of the witnesses who presented and attempted to corroborate the alternate perpetrator theory. As stated previously, Mrs. Moon presented the theory on behalf of the defense. Her daughters, Taylor and Carly, testified to corroborate Mrs. Moon's testimony, although at times offering contradictory testimony. Based on the court's personal observation of these witnesses' demeanor, tone, hesitation, and emotion during their testimony, the court did not find the testimony of these witnesses credible.

Based on these inconsistencies as well as others the court will not continue to enumerate here, the court finds the theory of the alternate perpetrator does not preponderate sufficiently heavily—or at all—against the verdict. Accordingly, the motion for a new trial based on the sufficiency of the evidence is due to be denied.

## 2.  Denial of Requests for Franks Hearing and Suppression

Dr. Moon contends the interests of justice demand a new trial because this court failed to conduct a *Franks* hearing.  (Doc. 132 at 23–36).  As Dr. Moon acknowledges, a challenge to an affidavit in support of a search warrant under *Franks* requires a "substantial preliminary showing" that "(1) 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Votrobek,* 847 F.3d 1335, 1342 (11th Cir. 2017) (citing *Franks v. Delaware,* 438 U.S. at 154, 155–56 (1978)).  Absent such a showing, Dr. Moon was not entitled to a *Franks* hearing.

The court denied Dr. Moon's request for a *Franks* hearing because he did not establish the existence of false statements that were material to the court's finding that probable cause existed.  Although Dr. Moon cited several different examples of what he considered "problems" with the affidavit, he concedes all but one of these examples consisted of accurate information.   Thus, none of these examples constitute a "deliberate falsehood."  *United States v. Whyte,* 928 F.3d 1317, 1333 (11th Cir. 2019)(citing *Franks,* 438 U.S. at 171).

For example, Dr. Moon alleged the affidavit stated that hebilled more than 24 hours a day.  It does not.  The affidavit cites a letter from Blue Cross Blue Shield noting that Dr. Moon's billing practices were outside the norm of his peers (doc. 48-

2 at 22 ¶ 53), and another letter that noted "*based on the estimates of time needed to complete the services* for which Moon was submitting claims," Dr. Moon billed 24 hours or more of service per day at least 46% of time (*id.* at ¶ 54 (emphasis added)). In fact, the affidavit correctly stated that these letters established upcoding to inflate reimbursement amounts which, combined with evidence of prescribing drugs without a legitimate purpose, was sufficient probable cause that Dr. Moon was engaged in health care fraud.  (*Id.* at 39 ¶ 101).

Other examples include the argument that the affidavit referred to Centers for Disease Control guidelines that were not in effect at the time the prescriptions were written, while conceding that the affidavit clearly referenced the publication date, or taking issue with the affidavit's allegation that Dr. Moon ranked 15th out of 13,425 medical professionals prescribing controlled substances, but conceding that the statistic is accurate.[3]  Finally, the defense argued the affidavit's identification of 25 prescriptions with a dosage over 1,000 MME[4] a day constituted a false statement but

---

[3] According to the defense, this statistic—although accurate—is misleading because not all 13,425 medical professionals have authority to write controlled substance prescriptions.  (Doc. 75 at 27).  The defense could not establish the number of doctors authorized to write these prescriptions because that number is not available from the State of Alabama. (*Id.* at 28). Dr. Moon concedes that the number of medical professionals authorized to write controlled substance prescriptions is unavailable, but nevertheless argues that the affidavit's failure to provide that number is evidence of a false statement. (Id. at 29).  The omission of a number that is not available is not a falsehood.

[4] "MME" is the "amount of milligrams of morphine an opioid dose is equal to when prescribed.  Calculating MME accounts for differences in opioid drug type and strength." https://www.cdc.gov/drugoverdose/opioids/terms.html (last visited August 17, 2020).

then later conceded the statement was likely a mathematical error, not an intentionally or recklessly false statement. (Doc. 75 at 39). But the existence of a mathematical error is insufficient grounds for conducting a *Franks* hearing. *Whyte,* 928 F.3d at 1333 ("Omissions made negligently or because of an innocent mistake are insufficient to warrant suppression of the evidence.").

After full briefing and argument, Dr. Moon's only support for the argument that the affidavit contained an intentionally or recklessly false statement was the unproven allegation that a pharmacist—whose testimony was included in the affidavit in support of the search warrant—later denied making certain statements when confronted by the defense's private investigator. But even if the court accepted the private investigator's hearsay statement and struck the pharmacist's testimony from the search warrant affidavit, there was still ample information in the search warrant affidavit to support the probable cause determination. Therefore, a *Franks* hearing was not required. *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009).

### 3. *Denial of Dr. Moon's Strikes for Cause*

Dr. Moon contends the court must grant a new trial because of its refusal to strike six potential jurors (specifically, Jurors 1, 2, 10, 20, 31, and 36) for cause. (Doc. 132 at 44–48). However, after the court denied his motion to strike those

jurors for cause, he used peremptory strikes on them (doc. 154), so that none ended up sitting on the jury.

As an initial matter, each of the challenged jurors stated that he or she could be fair to the defendant (doc. 134 at 86–88, 94–95, 98–101, 121–22, 134), and this court credited those statements. *See United States v. Villarreal*, 613 F.3d 1344, 1358 (11th Cir. 2010) ("[C]redibility determinations are the province of the district court.").

But even if the court abused its discretion in denying the motion to strike the potential jurors, the Supreme Court's decision in *United States v. Martinez-Salazar*, 528 U.S. 304 (2000) precludes Dr. Moon's claim. In *Martinez-Salazar*, the defendant used a peremptory strike on a potential juror after the district court denied his motion to strike that juror for cause. 528 U.S. at 309. The Supreme Court held no constitutional violation occurred because, by exercising his peremptory strike to remove the potential juror, he secured for himself "the constitutional guarantee of trial by an impartial jury." *Id.* at 316. Dr. Moon does not contend that the actual members of the jury were biased or that he was denied an impartial jury. Accordingly, under *Martinez-Salazar*, even if the court abused its discretion in denying the motion to strike for cause, the denial did not result in a constitutional violation and does not warrant a new trial.

### 4. *Courtroom Closures*

Dr. Moon contends the court violated his Sixth Amendment right to a public trial by completely closing the courtroom during part or all of the testimony of eighteen government witnesses. (Doc. 132 at 15–23; Doc. 157). "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const., amend. VI. But "[t]he Sixth Amendment right to a public trial is not absolute and must, on occasion, give way to other rights and interests." *United States v. Brazel*, 102 F.3d 1120, 1155 (11th Cir.1997). To justify closing the courtroom, there must be "an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller v. Georgia*, 467 U.S. 39, 48 (1984); *see also Presley v. Georgia*, 558 U.S. 209, 213–14 (2010).

### a. Standard of Review

Before addressing the merits of Dr. Moon's argument, the court must determine the appropriate standard of review. Dr. Moon contends that because a violation of the Sixth Amendment right to a public trial is a structural error, he is automatically entitled to a new trial without the need to show that the closure affected the verdict. (Doc. 132 at 17, 23). The government responds that Dr. Moon has waived any challenge to the courtroom closures because he raised this issue for

the first time in his post-verdict motion for new trial without ever having objected to the closure of the courtroom during the trial. (Doc. 145 at 25–35). In the alternative, the government argues the issue is subject to plain error review. (*Id.* at 35–36).

"[T]he vast majority of constitutional errors that occur at a criminal trial, including Sixth Amendment violations, should be examined for prejudicial effect and those errors do not require reversal if they are harmless." *United States v. Roy*, 855 F.3d 1133, 1167 (11th Cir. 2017) (en banc). But a violation of the Sixth Amendment right to a public trial based on the complete closure of the courtroom is one of the rare types of constitutional error that is considered structural: "a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself."[5] *Judd v. Haley*, 250 F.3d 1308, 1314–15 (11th Cir. 2001) (quotation marks omitted). "[S]tructural errors are not subject to harmless error review." *Id.* at 1315. Thus, in the context of a direct appeal of a conviction, a defendant who can demonstrate a violation of the right to a public trial is entitled to relief without a showing of prejudice. *Id.*

---

[5] The Eleventh Circuit has "recognized a distinction between total closures of proceedings . . . and situations where the courtroom is only partially closed to spectators." *Judd*, 250 F.3d at 1315. Here, the courtroom was entirely closed to the public, even if only for temporary periods of time. *See id.* at 1316 ("[A] total closure of a criminal trial during the presentation of evidence even for a temporary period, such as during the testimony of a particular witness, must be analyzed as a 'total closure.'").

The government correctly points out, however, that Dr. Moon never objected to any courtroom closure during the trial.[6]   (Doc. 145 at 25–35).   From this, the government concludes Dr. Moon has entirely waived the argument, such that the court may deny him relief without an analysis of the merits.   But although the government purports to cite a number of authorities holding that a defendant's failure to object to a violation of his right to a public trial waives the issue entirely (*see* doc. 145 at 30–31), those authorities do not, in fact, stand for that proposition.   For example, the government asserts the United States Supreme Court has recognized that a litigant who fails to assert a right to a public trial in a timely fashion is foreclosed from doing so later.   (Doc. 145 at 30).   But the government's support for that proposition comes not from a holding or even from dicta, but from a concurrence.   *See Freytag v. Commissioner*, 501 U.S. 868, 896 (1991) (Scalia, J., concurring in part and concurring in the judgment).

Likewise, the government's citation to *Levine v. United States*, 362 U.S. 610 (1960) is inapposite because that case involved a criminal contempt conviction and "[c]riminal contempt proceedings are not within 'all criminal prosecutions' to which [the Sixth] Amendment applies."   362 U.S. at 616.   Instead, the public trial right discussed in that case rose from the Due Process Clause of the Fifth Amendment.

---

[6] On one occasion, defense counsel suggested that the court keep the courtroom closed during the government's examination of a witness because they "probably [would] play a video on cross that may have something," and wanted to avoid

*Id.* This is not a distinction without a difference; the Court expressly noted that because the claim "derives from the Due Process Clause and not from one of the [explicitly] defined procedural safeguards of the Constitution, decision must turn on the particular circumstances of the case, and not upon a question-begging because abstract and absolute right to a 'public trial.'" *Id.* at 616–17 (citation omitted).

Nor does the government's citation to *United States v. Suescun*, 237 F.3d 1284 (11th Cir. 2001) establish that a defendant's failure to object to a purported structural error forfeits the claim entirely. In *Suescun*, the Eleventh Circuit stated in dicta that "[s]tructural defects do not absolve a defendant's waiver of a defense or objection." *Id.* at 1288 n.12. But the Court continued that such defects could be raised, subject to a more stringent standard of review. *Id.* This court will not find, in the absence of binding authority from the Eleventh Circuit or the Supreme Court, that a defendant waives a purported structural error entirely by failing to object to that error.[7]

But a defendant's failure to object to a structural error does subject the alleged error to plain error review. *Cf. United States v. Nelson*, 884 F.3d 1103 (11th Cir. 2018) (discussing, without deciding, the effect of a structural error on the plain error standard of review); *see also United States v. Anderson*, 881 F.3d 568, 572 (7th Cir.

---

[7]Because the parties do not address the applicability of invited-error review, neither will the court.

2018) (using plain error review to address a defendant's unpreserved claim that the court violated his right to a public trial); *United States v. Negron–Sostre*, 790 F.3d 295, 301 (1st Cir. 2015) (same); *United States v. Cazares*, 788 F.3d 956, 966 (9th Cir. 2015) (same); *United States v. Gomez*, 705 F.3d 68, 74–75 (2d Cir. 2013) (same).  The court will therefore review for plain error Dr. Moon's argument about the alleged violation of his Sixth Amendment right to a public trial.

"Under plain error review, there must be (1) an error, (2) that is plain, (3) that affects the defendant's substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. De La Garza*, 516 F.3d 1266, 1269 (11th Cir. 2008).  The Supreme Court has repeatedly addressed, but reserved ruling on, the question whether an alleged structural error automatically satisfies the requirement that the defendant show the error affected his substantial rights.  *See United States v. Marcus*, 560 U.S. 258, 263 (2010) ("[W]e have noted the possibility that certain errors, termed 'structural errors,' might affect substantial rights regardless of their actual impact on an appellant's trial,") (alteration and quotation marks omitted) (collecting cases).  The Eleventh Circuit has also noted but declined to answer that question.  *United States v. Nelson*, 884 F.3d 1103, 1108 (11th Cir. 2019) ("Whether the structural-error doctrine modifies a defendant's burden to satisfy all four plain-error factors remains unsettled.").  With the standard of review in mind, the court turns to the merits of Dr. Moon's argument.

b. *Merits*

Dr. Moon challenges the closure of the courtroom during the following parts of the trial: (1) all of non-victim Khyle McCord's testimony; (2) part of the direct examination of victims Kelly Tittle and Allie Robertson; (3) part of the direct examination and all of the cross-examination of victim Kelsey Ferguson; (4) most of the cross-examination of FBI analyst Tina Mauldin; (5) the cross-examinations of victims Cynthia Ramsey, Liesel French, Elaine Ward, and Kaci Moore; (6) the preliminary questioning on direct examination and the entirety of the cross-examination of victims Wendy Feng, Connie Yen, Josie Lent, Abigail Taylor, Caroline Morrison, Courtney Pickett, and Kara Rousseau; and (7) the preliminary questioning on direct examination and all of the questioning during and after cross-examination of victims Shelli Waddell, and Lisa Coble.  (Doc. 157).

The court notes that most of the challenged closures occurred during Dr. Moon's own cross-examination of government witnesses.  (*See id.*). Nevertheless, for ease of analysis, the court will assume every closure that Dr. Moon now challenges was error.

Even if every challenged closure was error, Dr. Moon has not explained how those errors were "plain."  *See United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013) ("For a plain error to have occurred, the error must be one that is obvious and is clear under current law.") (quotation marks omitted).  The parties represented

they had reached an agreement about when closure of the courtroom was appropriate and would inform the court when the testimony to be presented qualified under that agreement.  Absent an objection or other notification about the need to reopen the courtroom, the court had no way of knowing whether the upcoming testimony would come under the purview of the parties' agreement.  Dr. Moon has not pointed to any caselaw holding that, in circumstances like these, the court bears the responsibility to pause the testimony and determine whether closure remains appropriate.  Even if the court did bear that responsibility, no clear law sets out when or how the court must do so.  The court therefore doubts that Dr. Moon can satisfy his burden of showing that any error in closing the courtroom was plain.

Assuming the error was plain, however, it would be structural in nature.  *See Judd*, 250 F.3d at 1314–15.  As a result, for the reasons discussed above, the court will also assume Dr. Moon can satisfy the third prong of the plain error test and show the errors affected his substantial rights.  *See De La Garza*, 516 F.3d at 1269.  However, even if a defendant can establish the first three requirements of a plain error, the court must deny relief if the error did not "seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings."  *De La Garza*, 516 F.3d at 1269; *see also United States v. Monroe*, 353 F.3d 1346, 1349 (11th Cir. 2003) ("If all three conditions are met, [a] . . . court may . . . exercise its discretion to notice a forfeited error, but *only* if . . . the error seriously affects the fairness, integrity, or

public reputation of judicial proceedings") (emphasis added) (alteration and quotation marks omitted).  Here, granting a new trial in this case and under these circumstances would detrimentally affect the fairness, integrity, or public reputation of judicial proceedings.

Correction of a plain error should occur "'sparingly' and only in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Deason*, 965 F.3d 1252, 1265 (11th Cir. 2020) (some quotation marks omitted) (collecting cases).  This is because plain error review occurs only in the absence of a contemporaneous objection, and "the contemporaneous objection rule is essential to the integrity and efficiency of our judicial process." *United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998).  Among other benefits of a contemporaneous objection is allowing the court "to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial." *Id.* at 709.

Not only did the courtroom closures in this case not seriously affect the fairness, reputation, and integrity of the judicial proceedings, granting a new trial in these circumstances would do so.  Dr. Moon did not object to any of the closures; in fact, he and the government entered an agreement about when closure was necessary and indicated the parties would inform the court when it was appropriate to close

and open the courtroom.  If that is not invited error (which the parties have not argued, *see supra* 29 n.6), it is close to it.

Moreover, Dr. Moon does not argue or allege that any of the evidence presented while the courtroom was closed would have been any different if it had been open.  And, as discussed above, the evidence was more than sufficient to convict him: it was, in fact, overwhelming.  *See Johnson v. United States*, 520 U.S. 461, 470 (1997) (holding that a plain error did not substantially affect the fairness, reputation, or integrity of the judicial process in part because the evidence supporting the challenged element of the crime was overwhelming).  "Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it."  *Id.*  Because the judgment in this case is not a miscarriage of justice, Dr. Moon cannot satisfy the fourth prong of the plain error test.

### 5.  *Required Compliance with Department of Justice Regulations*

Department of Justice regulations prohibit Department employees from testifying about information acquired during the performance of their official duties without prior approval of the Attorney General of the United States.  28 C.F.R. § 16.21, *et seq.*  These so-called *Touhy* regulations require the party seeking testimony to provide an affidavit or written statement to the Department of Justice setting forth a summary of the testimony sought so that the Department can

determine whether to authorize the testimony.  28 C.F.R. §§ 16.23(c), 16.24.  At trial, the Department of Justice required *Touhy* compliance prior to allowing FBI Special Agent King to testify.

Here, Dr. Moon asserts three arguments relating to *Touhy*.  First, Dr. Moon argues that *Touhy* did not apply to these proceedings because the United States was a party.  (Doc. 132 at 58).  Second, Dr. Moon argues *Touhy* compliance violates a defendant's right to compulsory process.  (*Id.* at 59).  Third, Dr. Moon argues forcing a criminal defendant to comply with *Touhy* "raises serious due process concerns." (*Id.*).

For his first argument, Dr. Moon contends that "because the United States was a party in this matter, [he] should not have had to comply with the Government's demand for process under *Touhy*."  (Doc. 132 at 58).  The defense's argument is based on a misunderstanding of the law.  The application of these regulations is not limited to actions where the United States is not a party.  Section 16.23 sets forth the procedure by which a party can obtain testimony from a Department of Justice employee in cases where the United States is a party.  28 C.F.R. § 16.23.  That procedure requires the party seeking the testimony to provide the DOJ attorney with an affidavit or statement setting forth the testimony sought from the DOJ employee. *Id.*  This is the same procedure Dr. Moon followed at trial.

In his second and third arguments, Dr. Moon contends that requiring compliance with *Touhy* violates his rights under the Fifth and Sixth Amendments. (Doc. 132 at 58). The Eleventh Circuit has previously considered and rejected such arguments. *United States v. Bizzard,* 674 F.2d 1382, 1387 (11th Cir. 1982). Moreover, as Dr. Moon concedes, compulsory process is violated only when the defendant is deprived of the testimony that is relevant, material, and vital to his defense. (*See* Doc. 132 at 59 (*citing United States v. Valenzuela-Bernal,* 458 U.S. 858, 867 (1982)). In this case, Dr. Moon was not deprived of the agent's testimony at all. Consequently, Dr. Moon's challenge to the application of the *Touhy* regulations fails.

### 6.  *Testimony regarding Dr. Moon's pre-arrest silence*

At trial, Mrs. Moon testified that after the FBI raided the Industrial Athlete and seized the Mix Tapes, she never told the FBI the tapes had been stolen from them and returned with covert videos recorded on them. (Doc. 138 at 26). The government then asked one of the FBI agents working on the case if Dr. Moon mentioned the Mix Tapes during their four-hour interview of Dr. Moon on the day of the search or in the weeks after the search. (*Id.* at 180) In his motion for a new trial, Dr. Moon argues that the interests of justice require he be granted a new trial because the "Fifth Amendment forbids comments on a defendant's silence as evidence of guilt." (Doc. 132 at 43).

Dr. Moon's claim fails for three reasons.  First, Dr. Moon withdrew any objection to the question (*id.* at 183), and therefore waived this issue.  Second, Dr. Moon's claim fails because he did not invoke the privilege to remain silent.  *Salinas v. Texas,* 570 U.S. 178, 181 (2013).  Finally, because the testimony elicited involved the time before Dr. Moon's arrest or *Miranda* warnings, the government was free to impeach the exculpatory story by establishing that he had not told the story before trial.  *See United States v. O'Keefe*, 461 F.3d 1338, 1346 (11th Cir. 2006) ("The due process considerations addressed in *Doyle* are only implicated by the giving of a *Miranda* warning.").

### 7.    *Admissibility of Specific Evidence*

Dr. Moon argues that the court's admission of complete digital copies of the Mix Tapes and VHS tapes containing legal pornography was a miscarriage of justice.  (Doc. 132 at 36–42).  He also contends the exclusion of a boom box, smoke detector, and expert testimony constitutes a miscarriage of justice.  (*Id.*).  The court considers each argument in turn.

### a. <u>*Legal Pornography*</u>

Dr. Moon objects to the admission of VHS tapes containing only adult pornography.  (GX 15–40).  These tapes were admitted at trial but not viewed by the

jury.[8]  He also objects to the admission of GX 3A, GX 3A1, GX 4A, GX 11A, GX 13A, GX 13A13.  (Doc. 135 at 79).  In support of his objections, Dr. Moon argues that evidence of these other acts[9] was offered by the government to prove that he was acting in conformity with his character when he covertly recorded the minors and is therefore inadmissible under Federal Rule of Evidence 404(b).  (*Id.* at 36 – 42).  In addition, Dr. Moon argues the evidence is also inadmissible under Federal Rule of Evidence 403.

Federal Rule of Evidence 404(b) prohibits the admission of "other crimes, wrongs, or acts . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   Fed. R. Evid. 404(b)(2).  But evidence of other acts may be admissible for another purpose, such as proving intent and identity.  Fed. R. Evid. 404(b)(2).  And "Rule 404(b) 'is a rule of inclusion, . . . [therefore], 404(b) evidence, like other relevant evidence, should not be lightly excluded when it is central to the prosecution's case.'"  *Kapordelis*, 569 F.3d at 1313 (citing *United States v. Jernigan,* 341 F.3d 1273, 1280 (11th Cir. 2003)).

---

[8] Dr. Moon's suggestion that the court must assume the jury viewed these tapes is frivolous. As the defense is aware, the tapes were delivered to the jury in their original, VHS format and the jury was not given any technology with which to view them.

[9] The government argues that the evidence was intrinsic evidence and therefore excluded from Rule 404(b) analysis.  For purposes of Dr. Moon's motion, the court will assume all the legal pornography found on these tapes constitutes an extrinsic act.

The government contends that the evidence of legal pornography is admissible to prove Dr. Moon's intent and identity.  To be admissible for that purpose, the government must prove by a preponderance of the evidence that Dr. Moon owned the other tapes and the probative value of admitting the legal pornography cannot be substantially outweighed by its unfair prejudice.  *Eduoard,* 485 F.3d at 1344.

> i.    <u>GX 1–14</u>

Dr. Moon objects to the admission of the adult pornography contained on GX, 3, GX, 4, GX 11, and GX 13.[10]  (Doc. 113; Doc. 135 at 79).  During the trial, the jury saw 109 excerpts from the Mix Tapes, but no tape in its entirety.  Legal pornography existed on two of these excerpts; in both instances, the adult pornography was immediately adjacent to covert recordings of a woman undressed or undressing.  (*See* GX 3A1, 13A13).  Accordingly, the jury saw a few seconds of legal pornography (visible while fast-forwarding to the covert recordings) during the trial on one occasion.  But because complete versions of the Mix Tapes are included on the thumb drive provided to the jury, Dr. Moon argues the court must assume the jury viewed all four tapes in their entirety.[11]  (Doc. 135 at 137; Doc. 150 at 19).

---

[10] Dr. Moon's global objection to adult pornography on the Mix Tapes applies only to those tapes in which there is legal pornography.  Only GX3, GX4, GX11, and GX13 contain adult pornography.

[11] The court notes that this is a practical impossibility, given the length of time the jury deliberated and the hours of tape sent back to the jury.  The court did not provide the thumb drive

Adopting that assumption, the court evaluates the admission of the GX 3, GX 4, GX 11, and GX 13.

As an initial matter, the complete versions of these Mix Tapes were admissible to prove Dr. Moon's identity.  GX 3, GX 11, and GX 13 contained excerpts of Moon family home video; GX 4 contained excerpts of covert recordings that were obviously taken from Dr. Moon's property.  GX 13A13 is particularly relevant to prove identity.  (Doc. 135 at 132 (defense counsel stating "[i]t contained pornography, but I know why you want to play this one").  In this excerpt, a television screen playing legal pornography is filmed.  During the excerpt a listener can hear the man who is filming talking.  Given the content of what he is saying, it is clear the man recording the legal pornography is Dr. Moon.  (Doc. 135 at 139–40).

Moreover, the existence of legal pornography on these tapes is relevant to whether Dr. Moon intended the Mix Tapes to be lascivious.  "A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an

---

to the jury until 2:34 PM on the first day of deliberations. (Doc. 139 at 93).  The jury deliberated until 4:44 PM that day, giving it at most 2 hours and 10 minutes to view videos.  (*See id.* at 95).  The jury returned at 8:30 AM the next day and deliberated until it reached a verdict at 10:22 AM.  (*Id.* at 95; Doc. 140 at 3).  In other words, the jury had possession of the thumb drive for, at most, 3 hours and 52 minutes.  It simply could not have watched all of GX 3, GX 4, GX 11, and GX 13 in that period of time.

issue." *See United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007).  In this case, Dr. Moon did not take affirmative steps to remove intent as an issue.  In fact, by disputing the lascivious nature of the recordings, intent became a critical part of the government's case.  And, because the state of mind required for the charged and purpose of legal pornography are the same— exciting sexual desires—the first part of Rule 404(b) test is satisfied.  *Id.*

The second prong of the analysis is also satisfied.  Here, the evidence was found in Dr. Moon's office among other personal property.  He was the only person with access to the office.  Finally, the pornography was found on tapes Mrs. Moon admitted belonged to the family.  Given these facts, the jury could have found by a preponderance of the evidence that Dr. Moon is the person who put the legal pornography on these tapes.

The final inquiry is whether the probative value of these tapes outweighs its prejudicial effect.  Excluding evidence under this analysis is an extraordinary remedy that should be used sparingly.  *United States v. McGregor*, 960 F.3d 1319, 1324 (11th Cir. 2020).  In determining whether to exclude evidence, the court must view the evidence in the light most favorable to admission, maximizing its probative value and minimizing its unduly prejudicial impact.  *Id.*  After completing this analysis, it is clear the probative value of these tapes outweighs its prejudicial effect.

There is no question of the probative value of admitting the tapes in their entirety.  Dr. Moon contested the recordings of the children were intended to be sexually enticing.  The fact that Dr. Moon placed video excerpts of women—both adult and minor—in various state of undress on tapes containing other lascivious exhibitions, albeit legal exhibitions, is highly probative of intent.

There is, however, a question about whether being found to possess legal pornography is unfairly prejudicial.  Dr. Moon has not articulated why possession of legal pornography is unfairly prejudicial, but in any event "simply because the evidence is damaging or prejudicial to a defendant's case does not mean, however, that the evidence should be excluded. It is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1119 (11th Cir. 1990) (quotation marks omitted).  Under these circumstances, the court holds that evidence that Dr. Moon possessed legal pornography is not unduly prejudicial given its significant probative value with respect to his identity and intent.

The government had the substantial burden of proving Dr. Moon's intent. This evidence was highly probative to that issue.  The evidence helped establish his identity.  And any prejudicial impact caused by the admission of the legal pornography was lessened by the court's instruction to consider the evidence for only the limited purpose of proving intent and identity.

ii.   <u>GX 15–40</u>

Government's exhibits 15–40 are tapes that contain only legal adult pornography.   Dr. Moon argues these tapes should have been excluded from evidence because they are extremely prejudicial and that prejudice "substantially outweighed the *de minimis* probative value of said material."   (Doc. 132 at 4). Dr. Moon overestimates the prejudicial value of the tapes and underestimates their probative value.

Here, these tapes are also central to proving Dr. Moon's identity and intent. These tapes were found in Dr. Moon's office, by his desk and near a powered TV/VCR that was ready to play.   They were also found among the 14 VHS tapes which contained Moon family home video footage.   The fact that the Mix Tapes were located among Dr. Moon's collection of legal pornography gives context to Mix Tapes and highlights Dr. Moon's lascivious intent when making the covert recordings.   *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998).

Dr. Moon's prejudice argument is based on the content of the videos themselves.   According to Dr. Moon's description of the tapes, some of the pornography is "extremely graphic" (doc. 132 at 40) and some of it is violent, depicting rapes, strangulation, bondage and "snuff" (*id.* at 42).   But however graphic and violent the tapes were, the admission of GX 15 –40 was not unfairly prejudicial

on that basis because the pornography found on GX 15 – 40 was not described for or seen by the jury.

b. *Exclusion of the boombox and smoke detector*

During the FBI's search of Dr. Moon's office, agents uncovered an instruction manual for a boombox with a hidden camera and a smoke detector with a hidden camera inside.  (Doc. 135 at 31, 40).  At trial, Dr. Moon sought to admit a boombox and a smoke detector, both of which contained covert video cameras.  The defense claimed it found these items in Dr. Moon's office.  (Doc. 138 at 195– 96).

Federal Rule of Evidence 901 requires that a party seeking to admit evidence must produce sufficient evidence "to support a finding that the item is what the proponent says it is."  Fed. R. Evid. 901.  At trial, the defense acknowledged that no witness with personal knowledge could testify, based on personal knowledge, that these items were actually found in Dr. Moon's office.  (Doc. 138 at 195).  Because these items could not be properly authenticated, they were properly excluded from evidence.

Moreover, even if they could have been authenticated, the items found at Dr. Moon's office were of questionable relevance.  The government never presented any evidence that the covert videos taken in Dr. Moon's homes were made by a camera hidden inside a boombox or a smoke detector.  Indeed, the government presented no evidence about the form of the hidden camera that actually recorded

the videos.  The relevance of the boombox and the smoke detector is therefore unclear.  Moreover, even if those items were relevant, they would have confused the jury, given the complete lack of evidence that a boombox or smoke detector hidden camera was used to make the covert recordings in this case.

In any event, even if the evidence was properly authenticated, relevant, and not unduly confusing, the court's exclusion of it was harmless.  *See United States v. Jeri*, 869 F.3d 1247, 1259 (11th Cir. 2017) ("Erroneous evidentiary rulings will not result in reversal if they are harmless, meaning that the party asserting error has not shown prejudice to a substantial right.") (quotation marks omitted).  The court has already set out the overwhelming evidence of Dr. Moon's guilt, and will not repeat that evidence here.  Dr. Moon has not established that admission of a boombox and a smoke detector containing hidden cameras found in Dr. Moon's office would have had any effect on the outcome of this trial.

c.  *Exclusion of Defense Expert*

Dr. Moon also challenges the court's decision to exclude Arthur Hively, a purported expert on whether the images in this case conform with the definition and interpretation of lasciviousness.  (Doc. 132 at 56–57).  Dr. Moon maintains that Mr. Hively's experience as an investigator responsible for evaluating whether images met federal or state law definitions of child pornography qualified him as an expert on "whether the images in this case conform with the definition and

interpretation of lascivious exhibition." (Doc. 118 at 3).  Dr. Moon contends Mr. Hively's testimony should have been admitted because "the language of the child pornography statute is unclear."

Federal Rule of Evidence 702 permits a qualified expert to testify in the form of an opinion if the testimony will help the trier of fact determine a fact at issue. Fed. R. Evid. 702(a).  "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier,* 387 F.3d 1244, 1262 (11th Cir. 2004)).  Here, Dr. Moon argued that because "what constitutes 'lascivious exhibition' in each circuit and among district courts varies greatly, with no bright line rule or clear-cut analysis[,] . . . Mr. Hively's opinion 'whether the images in this case conform with the definition and interpretation of lascivious exhibition will aid in understanding the evidence and facts at issue.'"  (Doc. 118 at 4).  The proffered testimony is inadmissible.  It is well-settled that experts may not testify as to governing legal standards or legal implications of conduct; the court must be the jury's only source of law.  *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir. 1990).

Moreover, Mr. Hively's characterizations of the evidence would not assist the trier of fact because the test under which Mr. Hively proposed to evaluate the images at issue is not an exclusive test.  The Eleventh Circuit has repeatedly emphasized that what constitutes "lascivious exhibition" is not concrete and must be determined

by the images themselves.  *Holmes,* 814 F.3d at 1251.  Thus, Mr. Hively's exclusive

reliance on *Dost* would confuse the jury because testimony about whether an image

is child pornography based on whether it satisfies *Dost* is misleading.  As this court

repeatedly stated, *Dost* offers guidance a juror may consider, it is not a hard and fast

test that the jury was required to use in making its determination.

### 8.  Jury Instructions

Dr. Moon contends the court erred by declining to give six of his requested

instructions on the meaning of "lascivious exhibition of the genitals" (doc. 132 at

48–49), and by giving the government's requested instruction on concealment (*id.*

at 49).  The court will address each argument in turn.

### a. Lascivious Exhibition of the Genitals

As background, the parties agreed the court should give the Eleventh Circuit's

standard jury instruction on the meaning of "lascivious exhibition of the genitals."

(*See* Doc. 76; Doc. 138 at 228).  That instruction reads:

> "Lascivious exhibition" means indecent exposure of the genitals
> or pubic area, usually to incite lust.  Not every exposure is a lascivious
> exhibition.
>
> To decide whether a visual depiction is a lascivious exhibition,
> you must consider the context and setting in which the genitalia or
> pubic area is being displayed.  Factors you may consider include:
>
> • the overall content of the material;
>
> • whether the focal point of the visual depiction is on the minor's
>   genitalia or pubic area;

- whether the setting of the depiction appears to be sexually inviting or suggestive—for example, in a location or in a pose associated with sexual activity;
- whether the minor appears to be displayed in an unnatural pose or in inappropriate attire;
- whether the minor is partially clothed or nude;
- whether the depiction appears to convey sexual coyness or an apparent willingness to engage in sexual activity; and
- whether the depiction appears to have been designed to elicit a sexual response in the viewer.

Dr. Moon also requested a number of additional jury charges. (*See* Doc. 112). Of relevance to his current motion are his twelfth, thirteenth, fourteenth, fifteenth, seventeenth, eighteenth, and nineteenth requested charges.

The twelfth requested charge stated: "'Lascivious exhibition' is further defined as an image that potentially excites sexual desires or is salacious. Because what constitutes forbidden lascivious exhibition is not concrete, the lascivious nature of visual depictions should be determined with respect to the actual depictions themselves on a case-by-case basis." (Doc. 112 at 24). After discussing the proposed instruction with the parties, the court agreed to instruct the jury that "[b]ecause what constitutes lascivious exhibition is not concrete, the lascivious nature of visual depictions should be determined with respect to the actual depictions themselves on a case-by-case basis." (Doc. 138 at 231–33; *see also* Doc. 139 at 29). Thus, the only part of the instruction that the court did not give was the sentence: "'Lascivious exhibition' is further defined as an image that potentially excites sexual

49

desires or is salacious." But reading the jury that part of the requested instruction would have been redundant of the pattern jury instruction, which states that one factor to consider in determining whether a depiction is a lascivious exhibition of the genitals is "whether the depiction appears to have been designed to elicit a sexual response in the viewer."

Likewise, Dr. Moon's other requested charges were redundant of the charge that the court read to the jury. Dr. Moon's thirteenth requested charge was: "While the pictures must not always be 'dirty' or even nude depictions to qualify as lascivious, mere nudity of a minor alone is not enough to find lasciviousness." (Doc. 112 at 25). The court instructed the jury that "[n]ot every exposure [of the genitals or pubic area] is a lascivious exhibition." (Doc. 139 at 29). His fourteenth requested charge was: "The term 'lascivious exhibition' means a depiction which displays or brings to view to attract notice to the genitals or pubic area of children in order to excite lustfulness or sexual stimulation in the viewer. Not every exposure of the genitals or pubic area constitutes a lascivious exhibition." (Doc. 112 at 26). The court instructed the jury that "[l]ascivious exhibition' means indecent exposure of the genitals or pubic area, usually to incite lust. Not every exposure is a lascivious exhibition." (Doc. 139 at 29).

Dr. Moon's fifteenth requested charge was:

It is not a crime if someone subjectively believes that an innocuous picture of a child is 'lascivious.'  The defendant must believe that the picture contains certain material, and that material must in fact (and not merely in his estimation) meet the statutory definition of lascivious. 'Sexually explicit conduct' connotes an actual depiction of the sex act rather than merely the suggestion that it is occurring.

(Doc. 112 at 27).  The court instructed the jury on a number of factors that it could consider in determining whether the tapes contained sexually explicit conduct. (Doc. 139 at 29)).  The court also notes that an instruction about "an actual depiction of the sex act" would be confusing to the jury in this case because none of the minors were engaged in sex acts.

Dr. Moon's seventeenth requested charge was: "A video or photographic image must display 'sexually explicit conduct.'  Mere voyeurism is not enough." (Doc. 112 at 29).  The court instructed the jury at length about the definition of "sexually explicit conduct."  (Doc. 139 at 29).  Dr. Moon's eighteenth requested charge was: "Whether a video shows, objectively, a 'lascivious exhibition' depends on the content of the video itself and not on the sexual predilection of its creator. Therefore, the defendant's intent in producing a video cannot be the sole basis for finding lasciviousness."  (Doc. 112 at 30).  The court instructed the jury to consider "the actual depictions themselves."  (Doc. 139 at 29).  And his nineteenth requested charge was: "Whether the image was designed to elicit a sexual response in the viewer should be considered in determining the defendant's intent, but only to the

extent it is relevant to the analysis of the other five factors and the objective elements of the image." (Doc. 112 at 31).  The court instructed the jury to consider "the context and setting in which the genitalia or pubic area is being displayed." *(*Doc. 139 at 29).

In sum, each of the proposed instructions that Dr. Moon contends the court should have read to the jury was redundant of the instructions that the court did read to the jury.  A new trial is not necessary on this basis.

### b. *Concealment*

Before trial, the government requested a jury instruction on concealment. (Doc. 104 at 22–23).  Over Dr. Moon's objection (doc. 138 at 237–38), the court gave the requested instruction (doc. 139 at 26–27).  Dr. Moon argues a new trial is warranted because (1) that instruction relates only to flight or concealment as an element of the charged offence; and (2) conflicting evidence about the accessibility of the office where agents found the tapes made the instruction confusing for the jury. (Doc. 132 at 49–50).

The former Fifth Circuit's binding opinion in *United States v. Mesa*, 660 F.2d 1070 (5th Cir. Unit B, Nov. 12, 1891), forecloses both of Dr. Moon's arguments. *See Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (holding that decisions made by Unit B of the former Fifth Circuit after October 15, 1981 are binding on the Eleventh Circuit).  In *Mesa*, the defendants were charged with drug

crimes, 660 F.2d at 1073, which did not involve concealment as an element of the offense, *id.* at 1078 ("evidence of flight or concealment is not an element of the crime").  After a drug raid but before any warrants had been issued, two defendants spoke with someone from the police department, who rented a hotel room under an assumed name and gave a key them.  *Id.* at 1078.  While staying in the room under that assumed name, the defendants told a police officer "they did not want to be embarrassed by an arrest at home and wanted to surrender as soon as arrest warrants were issued." *Id.* at 1078.

The Fifth Circuit affirmed the district court's decision to instruct the jury on concealment.[12]  *Mesa*, 660 F.2d at 1078.  The Court explained that although "the jury could have found an innocent motive from these actions, the evidence also supports an inference of attempted concealment." *Id.*  Thus, concealment does not have to be an element of the offense to warrant giving the instruction, and conflicting evidence about whether Dr. Moon concealed the tapes does not make the court's decision to give the instruction erroneous.

Even if the court did err in giving the concealment instruction, any error was harmless. *See United States v. Focia*, 869 F.3d 1269, 1280 (11th Cir. 2017).  The instruction informed the jury that concealment "is not, of course, sufficient in itself

---

[12] The concealment instruction that the court gave in *Mesa* differs somewhat from the concealment instruction that the court gave in this case.  *Compare Mesa*, 660 F.2d at 1077 n.2, *with* (Doc. 139 at 26–27).  The difference in the wording is not material.

to establish the guilt of [the defendant]" and that, assuming the jury found concealment, the jury had to consider that fact "in light of all of the other evidence in the case." (Doc. 139 at 26). As discussed above, there was sufficient evidence for the jury to convict Dr. Moon on all counts.

Because the court did not err in giving the concealment instruction and, even if the court did err, that error was harmless, a new trial is not warranted on this basis.

## III.   CONCLUSION

Based on all the foregoing, Dr. Moon's motion for acquittal and motion for new trial are **DENIED.**

**DONE** and **ORDERED** this September 14, 2020.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE